UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Franchetta Hollington,<br><br>  Plaintiff,<br><br>v.<br><br>First-Citizens Bank & Trust Company;<br>and Reeves Skeen, individually,<br><br>  Defendants. | Case No. 2:24-cv-01306-BHH<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

As and for her Complaint, Plaintiff Franchetta Hollington states and alleges the following against Defendant First-Citizens Bank & Trust Company (herein, "Defendant", "First Citizens" or the "Bank"), and Reeves Skeen (individually herein, "Skeen") (collectively herein, "Defendants"):

**NATURE OF THE ACTION**

1. The claims set forth herein relate to Defendants paying Plaintiff inferior and unequal wages based on her gender in violation of Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and Defendants' failure to promote Plaintiff or pay her commensurate with white comparators, in violation of the Civil Rights Act of 1888, 42 U.S.C. § 1981 ("Section 1981").

**PARTIES**

1

2. Plaintiff Franchetta Hollington is domiciled in the State of South Carolina, as she permanently resides in Charleston County, South Carolina.

3. Upon information and belief, Defendant First-Citizens Bank & Trust Company is a corporation incorporated under the laws of North Carolina, with bank branches across the State of South Carolina. At all relevant times, Defendant First-Citizens Bank & Trust Company met the definition of an "employer" under all relevant statutes.

4. Upon information and belief, Defendant Skeen, who is male and white and the Bank's "Area Executive," is a resident and citizen of the State of South Carolina, residing in Charleston County. At all relevant times, as Area Executive exercising authority over compensation, hiring and promotional decisions, and materially participating in the statutory violations alleged herein. Thus, Defendant Skeen meets the definition of Plaintiff's "employer" under the EPA and Section 1981.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Franchetta has alleged a cause of action under the Fair Labor Standards Act, 29 U.S.C. § 206(d) (Equal Pay Act) and 42 U.S.C. § 1981 ("Section 1981").

6. Venue is proper under § 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in the District of South Carolina, Beaufort Division.

## FACTS

7. On the first page of the Bank's Employee Manual ("Manual"), First Citizens purports to "**provide equal employment opportunity for all persons** by administering recruitment, hiring, training, **promotion**, **compensation**, benefits and privileges of

2

employment, **appointments for advancement (including upgrading and promotion)**, transfers, relocations, social and recreation programs, and terminations of employment (including layoffs and recalls) for all associated without discrimination because of race (include traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, **sex** …" (Emphasis added).

8. In the Manual, the portions of which have been cited in this Complaint are attached hereto as **Exhibit A,** First Citizens purports to have a policy of equal employment opportunity and an Affirmative Action Program, stating:

> **The Bank has long pursued a policy of employment opportunity and affirmative action, which work together to foster inclusion and diversity of our associates.** The Bank feels strongly that employment opportunity is not only a legal and economic necessity, but essential to ensure all associated have equal access to resources enabling them to reach their full potential. Our Affirmative Action Program evaluates our employment practices and establishes diversity goals to measure our success toward achieving that result.
>
> […]
>
> The Bank hires well-qualified people to perform the many tasks necessary in providing high quality products and services at a reasonable cost. An integral part of this Policy is to **provide equal employment opportunity for all persons** by administering recruitment, hiring, training, **promotion**, **compensation**, benefits and privileges of employment, **appointments for advancement (including upgrading and promotion)**, transfers, relocations, social and recreation programs, and terminations of employment (including layoffs and recalls) for all associated without discrimination because of race (include traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, **sex**, age, disability, protected veteran status, sexual orientation, gender identity, genetic information, military membership, application, or obligation, or any other legally protected status.
>
> […]

3

> To accomplish these aims, specific accountabilities have been established for carrying out the Bank's Equal Employment Opportunity ("EEO") and Affirmative Action Policy and Affirmative Action Program stated herein. The Chief Human Resources Officer has the overall responsibility for the administration of the Bank's Affirmative Action Program and enforcement of the EEO Policy, Management of the Bank will be held accountable for achieving the placement goals set further for their areas.
>
> A detailed system to audit, report, and monitor the achievements attainment set forth in the Bank's Affirmative Action Program has been established and results will be reported to the Chief Human Resources Officer and managers (signatories) responsible for each affirmative action plan of the Bank on at least an annual basis. The Bank and its management intend to further the principles of affirmative action and equal opportunity so full utilization of our minority and female workforce may be achieved, and so the skills offered by qualified individuals with disabilities and protected veterans in the workforce are maximized within the Bank.
>
> **Every management level associate of the Bank is responsible for encouraging and increasing employment opportunities for minorities, females,** individuals with disabilities and protected veterans in the workforce are maximized within the Bank.
>
> **Every management level associate of the Bank is responsible for encouraging and increasing employment opportunities for minorities, females, individuals with disabilities, and protected veterans in the workforce and maintaining an atmosphere conducive to a civil and professional workplace through practices and person example. All management staff shall take an active and/or supportive role in both the planning and implementation of the Bank's Affirmative Action Program and enforcing the Bank's EEOC Policy.**

Exhibit A at 8-10, emphasis added.

9. On the "About Us" page[1] of its website, First Citizens purports to be "focused on inclusion, equity and diversity" and committed to "embracing diversity, disavowing discrimination and advancing our inclusion, equity and diversity efforts."

10. However, in her over twenty (20) years as an employee of First Citizens, by virtue of her tenure and floating in numerous different Bank branches across South Carolina, Plaintiff was subjected to discriminatory employment practices based on gender and race across the First Citizens branches in which she worked.

11. In the last five years, the Bank's branches in the Charleston, South Carolina Region into the "Metro Charleston Market" and the "North Charleston Market." The respective Markets included the following Bank branch location:

   **Metro Charleston Market:**

   i. **Charleston Main Branch:** 182 Meeting St. Charleston, SC

   ii. **West Ashley Branch:** 1624 Sam Rittenburg Boulevard, Charleston, SC

   iii. **Folly Rd. Branch:** 426 Folly Road, Charleston, SC

   iv. **Johnnie Dodds Branch:** 903 Johnnie Dodds Blvd, Charleston, SC

   v. **17 N Branch:** 2676 US Hwy 17 N, Mt. Pleasant, SC

---

[1] https://www.firstcitizens.com/about-us/inclusion-equity-diversity#:~:text=Leaders%20are%20committed%20to%20embracing,the%20needs%20of%20the%20bank.

5

      vi. **Hollywood:** 6213 SC Hwy 162, Charleston, SC. (On or around the fourth quarter of 2021, this branch was assigned to the Bluffton region, though Plaintiff remained responsible for staffing this branch.)

      vii. **Daniel Island:** 126 Seven Farms Drive, Charleston, SC

- **North Charleston Market**

      i. **Ashley Phosphate Branch:** 2170 Ashley Phosphate Road, Charleston, SC

      ii. **Summerville Main Branch:** 218 South Main Street, Summerville, SC

      iii. **Summerville/Nexton 1-26 Branch:** (closed but relocated in Nexton and now considered **"Nexton Branch"**): 107 First Citizens Way, Summerville, SC

      iv. **Oakridge Branch:** 5090 Dorchester Rd, N Charleston, SC

      v. **North Trident Branch** (currently closed)

      vi. **Oakbrook Branch:** 1801 Trolley Road, Summerville, SC

      vii. **Hanahan Branch:** 1248 Yeamans Hall Road, Hanahan, SC

12. According to the 2023 US Census, **Charleston County, South Carolina is 71.3% white, and 24.3% Black,** with the remaining percentages made up by other groups[2].

---

[2] https://www.census.gov/quickfacts/fact/table/charlestoncountysouthcarolina/PST045222, accessed March 15, 2024.

13. According to the 2023 US Census, the **City of Charleston, South Carolina is of 73.7% white and 18.2% Black**, with the remaining percentages made up by other groups.[3]

14. According to the 2023 US Census, **the City of North Charleston, South Carolina** (only a small portion of which includes Charleston County), **is 39.6% white, and 44.8% Black**, with the remaining percentages made up by other groups.[4]

15. Between 2017 and 2022, Plaintiff worked as a Supervisor Area Retail Support (SARS), and "floated" to the Bank's various Charleston County branches.

16. As an SARS, Plaintiff assisted in the professional development of fifteen (15) Bank employees in the Teller floater pool, scheduled staffing coverage for the entire Charleston Metro and North Charleston Markets while also, when needed, performing duties of a platform associate, teller, vault teller, and operational service supervisor with full authorization to issue home equity loans, home improvement loans, ordering cash for any branch, Teller Leader and Manager, and more.

17. In 2020, the Charleston Metro Market Manager of Retail Banking ("MRB"), who is a white woman, was on medical leave. As such, from around June 2020-January 2021 (eight months), Plaintiff performed the MRB role for the Charleston Metro Market.

18. During this time, Plaintiff was introduced at meetings as the "temporary MRB" of the Charleston Market.

---

[3]https://www.census.gov/quickfacts/fact/table/charlestoncitysouthcarolina,charlestoncountysouthcarolina/PST045222. Accessed March 15, 2024.
[4]https://www.census.gov/quickfacts/fact/table/northcharlestoncitysouthcarolina,charlestoncitysouthcarolina,charlestoncountysouthcarolina/PST045222. Accessed March 15, 2024.

19. During this time, Plaintiff performed the same MRB duties as other MRBs in the Charleston Metro and North Charleston Market branches. Namely, Plaintiff:
    - Managed all the branches with regard to sales, personnel and inter-Markets human resource matters, client matters, and managed the branch managers, the SSRs, and the Teller line within the Charleston Market (a total of seven branches).
    - Additionally, Plaintiff's authorization limits were the same as an MRB.

20. Despite performing the MRB role for eight months with no infractions or counseling, Plaintiff's pay rate was not increased, and her performance of the MRB role was not discussed by Bank management as part of a larger career-advancing opportunity.

21. While working as the MRB for the Charleston Metro Market, Plaintiff *also* performed the SARS role for both the Metro Charleston and North Charleston Markets.

22. Despite Plaintiff's dual roles of SARS and MRB of the Charleston Metro Market—with seven (7) branches, she was paid **$26.50 per hour (roughly $55,000 a year)**, while Jason Maurer, a white Bank employee who was performing **only** the MRB role over the North Charleston Market—also seven (7) branches— was compensated with a **$125,000 annual salary**.

23. Plaintiff's and Mr. Maurer's roles as an MRB were essentially the same: Plaintiff and Mr. Mauer had both worked for years in banking; they worked the same hours; and they both oversaw seven (7) branches, were responsible for employee discipline and coaching, had the same customer-facing responsibilities, and had the same authorization amounts.

24. In 2021, while performing her SARS role, a white employee was hired as an FSR and Plaintiff was to be her direct manager. Because Plaintiff was involved with the onboarding process, she saw the employee's pay, which was $11,000 more than what Plaintiff made annually.

25. Plaintiff subsequently complained to Cara Earhart, the Bank's Regional Operations Manager/ Branch Operations Manager, about this subordinate white employee's pay far exceeding Plaintiff's.

26. Despite Ms. Earhart responding that she knew of a previous similar situation within the Bank in which the manager's pay was increased, at no time was Plaintiff's pay rate brought commensurate with her subordinate white employee's pay rate.

27. Also in 2021, the Charleston Metro Market's former MRB who is a white woman — returned, and failed the required licensing exam for the position; she was subsequently terminated.

28. Following this MRB's termination, Defendant Skeen told Plaintiff, "If you're thinking about the MRB role [for Charleston Metro], you're not going to get it. **This job is too much for you**."

29. Curiously, however, Defendant Skeen required **Plaintiff—formally a subordinate to an MRB—**to interview Eric Craine, a white employee hired from outside the Bank, for the MRB position over the Charleston Metro Market. Defendant Skeen instructed Plaintiff to "report back" to Skeen regarding her opinion of Mr. Craine to fill the MRB role.

30. The Bank hired Mr. Craine as MRB over the Charleston Metro Market.

9

31. Also in 2021, Plaintiff told Mr. Craine, the new MRB of the Charleston Metro Market, that she was interested in a posted Financial Services Manager ("FSM", which is below the level of MRB)) position at the Charleston Main Branch location in downtown Charleston. Mr. Craine responded that he would need to "mention this to Reeves [Defendant Skeen]."

32. Days later, Mr. Craine told Plaintiff that Defendant Skeen "wasn't shocked you'd be interested in being an FSM over Charleston Main, but he said **it's too big for you**."

33. Mr. Craine continued that Defendant Skeen had indicated he was "looking for someone with more business experience."

34. In response, Plaintiff emphasized to Mr. Craine that the Charleston Main Branch's business portfolio was combined with the Branch's previous location in Marion Square in downtown Charleston, and that she had helped build that portfolio over her many years with the Bank.

35. At the time Plaintiff requested consideration for the FSM position at the Charleston Main Branch, Plaintiff had spent 14 years of her banking career in the Bank's Charleston Metro Market.

36. Common refrains among staff and customers in the Charleston Metro Market for any issue or question was, "you need to ask Fran" or "you need to talk with Fran" [Plaintiff].

37. Instead of promoting Plaintiff to FSM of the Charleston Main Branch, Defendant Skeen hired Matthew Montanari, a white employee **in his third year of banking**, for the position.

38. In 2022, Plaintiff initiated a conversation with Defendant Skeen regarding her unfair compensation, and requested a raise to $85,000 in consideration of her work as an MRB for eight months and tenure with the Bank, to which Defendant Skeen did not immediately respond.

39. After Plaintiff had been denied consideration for the FSM role at the Charleston Main Branch, and after she had asked for a raise in consideration of her performance of the MRB role for eight months and tenure with the Bank, on Defendant Skeen's instruction, Jason Maurer instead offered Plaintiff a "dual role" managing two North Charleston Market branches: FSM of the Ashley Phosphate Branch, and the MRB of the Oakridge Branch.

40. The Oakridge Branch is designated as a Community Reinvestment Act ("CRA") branch.

41. The primary purpose of the CRA is "intended to encourage depository institutions to help meet the credit needs of the communities in which they operate, including low- and moderate-income (LMI) neighborhoods, consistent with safe and sound banking operations."[5]

42. Upon information and belief, bankers in the Charleston Metro Market have more opportunities for growing their business portfolios than bankers in the North Charleston Market, whose customers' income are moderate to lower, versus higher customer incomes in the Charleston Metro Market.

---

[5] https://www.fdic.gov/regulations/resources/director/presentations/CRA.pdf. Accessed March 6, 2024.

11

43. The Bank and Defendant Skeen refused to promote Plaintiff to an FSM role in a single branch (Charleston Main Branch) in the Charleston Metro Market where the majority of her career had taken place and where customers knew her, and staff sought guidance from her.

44. Stated differently, suddenly Plaintiff was good enough to take the MRB role at a CRA branch, and an FSM role at another North Charleston location, but not good enough to run a branch in the Charleston Market.

45. Upon information and belief, despite her experience, tenure, and proven qualifications, the Bank and Defendant Skeen did not want Plaintiff, a Black woman, as the "face" of the Charleston Market. As such, but for her race, Plaintiff would have been promoted to the managerial role of the Charleston Main Branch.

46. Rather, the Bank and Defendant Skeen were comfortable with Plaintiff as the face of the North Charleston Market.

47. Plaintiff told Mr. Maurer she was declining the dual role in the North Charleston Market.

48. In response to Plaintiff declining the dual role in the North Charleston Market, Defendant Skeen called Plaintiff around December 2022 about her declination. Plaintiff told Defendant Skeen that she would consider the position for a salary of $85,000.00, which was less than the $100,000-$120,000 salary Mr. Montanari was compensated as an **FSM** of a single branch (Charleston Main), and **not as an MRB**.

49. Defendant Skeen refused Plaintiff's request for an $85,000.00 per year salary, and threateningly replied, **"Do you understand what will happen to your career if you don't take this role?"**

50. Instead of accepting the dual role with more responsibility at inferior compensation to Mr. Montanari, Plaintiff accepted a lower role, as an FSM over the Oakridge and Ashley Phosphate Branches.

51. All FSMs perform the following duties and responsibilities:

    (a) Oversee the operations of their assigned Branch;

    (b) Manage the Branch's employees, including ensuring sales targets are met, training staff, leading and developing the Branch's team, conducting regular staff meetings;

    (c) Ensure compliance with company policies and regulations;

    (d) Oversee and implement marketing;

    (e) Ensure Branch profitability;

    (f) Maintain a high degree of customer satisfaction, and maintain and develop positive relationships with existing and prospective clients.

52. While Plaintiff performed the duties of a FSM over **two** branches, the following men who were FSMs over only **one** branch, had the same duties and responsibilities as above and worked the same hours as Plaintiff, but were paid more than Plaintiff during the statutory limitations period:

    - Ted Moore, FSM at Folly Rd. paid roughly $100,000-$120,000

    - Eric Lindsay, FSM at Johnnie Dodds paid roughly $100,000-$120,000

13

- Alex Haman, FSM Oakridge: paid roughly $100,000-$120,000
- Matthew Montanari, FSM Charleston Main Branch: paid roughly $100,000-$120,000
- Rocky Ryan, FSM 17 North: paid roughly $100,000-$120,000

53. On or around April 2023, Plaintiff complained to Defendant Skeen and Mr. Maurer regarding the pay differences based on gender and race that she had observed. But, to Plaintiffs' knowledge, no remedial actions to remedy the pay disparities Plaintiff identified were taken as following these complaints.

54. On or around May 2023, because neither the Bank nor Defendant Skeen remedied the unequal pay based on her gender, and intentional discrimination based on her race with regard to the Bank's and Defendant Skeen's failure to promote her to the Charleston Main Branch, Plaintiff resigned.

**FIRST CAUSE OF ACTION:**
**VIOLATION OF THE EQUAL PAY PROVISIONS OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 206(d)**

55. Plaintiff restates and re-alleges the allegations in the foregoing paragraphs, as if set forth fully herein.

56. Over her twenty-year tenure with the Bank, Plaintiff performed work under similar working conditions with equal skill, effort, and responsibility, to the work of male employees in substantially similar—if not equal— positions, who were paid more than her from 2021-2023.

57. All FSMs perform the following duties and responsibilities:

(a) Oversee the operations of their assigned Branch;

14

(b) Manage the Branch's employees, including ensuring sales targets are met, training staff, leading and developing the Branch's team, conducting regular staff meetings;

(c) Ensure compliance with company policies and regulations;

(d) Oversee and implement marketing;

(e) Ensure Branch profitability;

(f) Maintain a high degree of customer satisfaction, and maintain and develop positive relationships with existing and prospective clients.

58. While Plaintiff performed the duties of a FSM over **two** branches, the following men who were FSMs over only **one** branch, had the same duties and responsibilities as above and worked the same hours as Plaintiff, but were paid more than Plaintiff during the statutory limitations period:

- Ted Moore, FSM at Folly Rd.: paid roughly $100,000-$120,000
- Eric Lindsay, FSM at Johnnie Dodds: paid roughly $100,000-$120,000
- Alex Haman, FSM Oakridge: paid roughly $100,000-$120,000
- Matthew Montanari FSM Charleston Main Branch: paid roughly $100,000-$120,000
- Rocky Ryan FSM 17 North: paid roughly $100,000-$120,000

59. The Bank's Employee Manual does not identify a seniority system, a merit system, a system tying earnings to quality or quantity of production, or any other system for determining which employees were eligible for raises.

60. No seniority system, merit system, system tying earnings to quality or quantity of production, or any other system for determining which employees were eligible for raises was ever described to Plaintiff.

61. There is no explanation for Plaintiff's inferior compensation other than her gender.

62. As detailed in this Complaint, at all relevant times, Defendant Skeen, who is a male and the Bank's "Area Executive," exercised a high level of control over the EPA violations alleged herein, including but not limited to exercising authority over decisions regarding Plaintiff's and her comparators' compensation.

63. Even after being placed on notice at least twice by Plaintiff that her pay was not commensurate with males in the same roles, neither the Bank nor Defendant Skeen investigated her complaints or remedied the gender pay disparity.

64. Defendants knew and/or showed reckless disregard for the matter of whether their conduct was prohibited by the Equal Pay Act.

65. Defendants' wage discrimination constitutes a willful violation of the Equal Pay Act.

66. Had Plaintiff been paid a wage equal to that of the male employees who performed equal work to the work she performed, she would have been paid at a comparable rate to the other male FSMs.

67. Plaintiff is entitled to damages in an exact amount to be proven at trial, liquidated, for a three-year statutory period, plus recovery of her attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**(Discrimination in Violation of Section 1981)**

68. Plaintiff restates and re-alleges the allegations in the foregoing paragraphs, as if set forth fully herein.

69. As detailed in this Complaint, at all relevant times, Defendant Skeen, who is a white and the Bank's "Area Executive," exercised a high level of control over the Section 1981 violations alleged herein, including but not limited to exercising authority over decisions regarding Plaintiff's and her comparators' compensation and promotions.

70. By the actions described in this Complaint, Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are white, including, but not limited to:

    (a) Intentionally refusing to compensate Plaintiff commensurate with Mr. Maurer—who is white—despite Plaintiff performing the dual roles of SARS and MRB of the Charleston Metro Market. Mr. Maurer was compensated at $125,000 annually, and Plaintiff at **$26.50 per hour (roughly $55,000 per year);**

    (b) Intentionally refusing to promote Plaintiff to a managerial role over the Charleston Main Branch, and instead:

         i. Filling the managerial role at the Charleston Main Branch with a white employee, Matthew Montonari, with significantly less experience than Plaintiff; and

17

        ii. Offering Plaintiff a "dual role" in which she would be paid less than $85,000.00, which is less than Mr. Montonari was paid.

(c) Compensating Plaintiff's white subordinate with less experience than Plaintiff at a rate of approximately $11,000 more than Plaintiff's annual compensation; and

(d) Failing to correct or remedy these pay disparities, even after Plaintiff complained to Defendants about the same.

71. There is no other explanation for the disparity between Plaintiff's compensation and these white employees' compensation other than her race.

72. But for Plaintiff's race, Plaintiff would have received a raise for her dual role, been promoted to manager of the Charleston Main Branch, and had her compensation raised to reflect her supervisory role over her white subordinate.

73. The actions described herein evidence Defendants' malice toward Plaintiff as a Black person, and were conducted in reckless disregard of Plaintiff's rights under Section 1981.

74. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered monetary and/or economic harm for which she is entitled to an award of damages for a four-year statutory period.

75. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

76. As described in this Complaint, but for Defendants' intentional racial animus against Plaintiff, Plaintiff would have enjoyed the same terms and conditions, including compensation and promotions, as white Bank employees, and Plaintiff is entitled to punitive damages against Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Franchetta Hollington prays for the following relief:

77. Judgment against Defendants, joint and severally, for actual damages in the amount to be proven at trial, which naturally flow from Defendant's statutory violations;

78. Judgment against Defendants, joint and severally, for punitive and/or liquidated damages, in an amount to be proven at trial, for Defendants' violation of the Equal Pay Act, 29 U.S.C. § 206(d) et seq.;

79. Judgment against Defendants, joint and severally, for compensatory (including emotional damages) damages and punitive damages, in an amount to be proven at trial, for Defendants' reckless disregard of Plaintiff's rights under 42 U.S.C. § 1981;

80. Judgment against Defendants, joint and severally, for Plaintiff's reasonable attorneys' fees and costs incurred in this action; and

81. For such other relief as the Court deems just and equitable.


Dated: March 18, 2024

*/s/Paul J. Doolittle*
Paul J. Doolittle
**POULIN | WILLEY | ANASTOPOULO, LLC**

32 Ann Street
Charleston, SC 29403
(P): (803) 222-2222
(F): (843) 494-5536

Email: paul.doolittle@poulinwilley.com

Casey Martens
**Kim & Lahey Law Firm, LLC**
3260 Pelham Rd. #213
Greenville, SC 29615
(864) 973-6688
Cmartens@kimandlahey.com

*Counsel for Plaintiff*

20